TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
ANDREW W. FERICH (*pro hac vice*)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Tel: 310.474.9111; Fax: 310.474.8585

TIMOTHY G. BLOOD (SBN 149343)
*tblood@bholaw.com*
PAULA R. BROWN (SBN 254142)
*pbrown@bholaw.com*
JENNIFER L. MACPHERSON (SBN 202021)
*jmacpherson@bholaw.com*
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619.338.1100; Fax: 619.338.1101

LAURENCE D. KING (SBN 206423)
*lking@kaplanfox.com*
MATTHEW B. GEORGE (SBN 239322)
*mgeorge@kaplanfox.com*
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Tel: 415.772.4700; Fax: 415.772.4707

[additional counsel appear on signature page]

*Class Counsel for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| JOHN HARBOUR, TAMI WISNESKY, JOWELI VUNISA, and J. DOE, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>CALIFORNIA HEALTH & WELLNESS PLAN, HEALTH NET OF CALIFORNIA, INC., HEALTH NET LIFE INSURANCE COMPANY, CENTENE CORPORATION, HEALTH NET COMMUNITY SOLUTIONS, INC., HEALTH NET, LLC and ACCELLION, INC.,<br><br>        Defendants. | Case No. 5:21-cv-03322-EJD<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE:    January 11, 2024<br>TIME:    9:00 A.M.<br>JUDGE:  Hon. Edward J. Davila<br>CTRM:   4, 5th Floor<br><br>[Filed concurrently with the Declarations of Cameron R. Azari, Esq. and Tina Wolfson] |

1    <u>**NOTICE OF MOTION AND MOTION**</u>

2    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

3        **PLEASE TAKE NOTICE** that on January 11, 2024, at 9:00 a.m., in Courtroom 4 of the United

4    States District Court for the Northern District of California, Robert F. Peckham Federal Building &

5    United States Courthouse, 280 South 1st Street, San Jose, 95113, the Honorable Edward J. Davila

6    presiding, Plaintiffs John Harbour, Tami Wisnesky, Joweli Vunisa, and J. Doe (collectively,

7    "Plaintiffs"), will and hereby do move for an Order for Final Approval of Class Action Settlement.

8        This motion is based upon this Notice of Motion and Motion; the Memorandum of Points and

9    Authorities; the concurrently filed Declarations of Cameron R. Azari, Esq. and Tina Wolfson; the Class

10   Action Settlement and Release previously filed with the Court (ECF No. 53), and all papers filed in

11   support thereof; the argument of counsel; all papers and records on file in this matter; and such other

12   matters as the Court may consider.

13
     DATED: December 21, 2023                    Respectfully submitted,
14
                                          By: */s/ Tina Wolfson*
15                                            TINA WOLFSON (SBN 174806)
                                              *twolfson@ahdootwolfson.com*
16                                            ROBERT AHDOOT (SBN 172098)
                                              *rahdoot@ahdootwolfson.com*
17                                            **AHDOOT & WOLFSON, PC**
18                                            2600 W. Olive Avenue, Suite 500
                                              Burbank, CA 91505-4521
19                                            Telephone:  310.474.9111
                                              Facsimile:   310.474.8585
20
                                              ANDREW W. FERICH (*pro hac vice*)
21                                            *aferich@ahdootwolfson.com*
                                              **AHDOOT & WOLFSON, PC**
22                                            201 King of Prussia Road, Suite 650
23                                            Radnor, PA 19087
                                              Telephone:  310.474.9111
24                                            Facsimile:   310.474.8585

25                                            TIMOTHY G. BLOOD (SBN 149343)
26                                            *tblood@bholaw.com*
                                              PAULA R. BROWN (SBN 254142)
27                                            *pbrown@bholaw.com*
                                              JENNIFER L. MACPHERSON (SBN 202021)
28

- 1 -

*jmacpherson@bholaw.com*
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, CA  92101
Telephone: 619.338.1100
Facsimile: 619.338.1101

LAURENCE D. KING (SBN 206423)
*lking@kaplanfox.com*
MATTHEW B. GEORGE (SBN 239322)
*mgeorge@kaplanfox.com*
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415.772.4700
Facsimile:  415.772.4707

*Class Counsel for Plaintiffs and the Class*

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF THE ISSUES TO BE DECIDED .......................................2

III.   BACKGROUND..................................................................................................2

      A.     The Health Net FTA Data Breach and Subsequent Litigation ...................2

      B.     Mediation and Settlement Negotiations ....................................................3

      C.     Information Learned Prior to Mediation and Through Confirmatory Discovery........4

      D.     Preliminary Settlement Approval and Dissemination of Notice ................5

      E.     Class Response ..........................................................................................6

IV.   THE SETTLEMENT...........................................................................................6

      A.     The Settlement Class .................................................................................6

      B.     The Release ...............................................................................................6

      C.     The Settlement Benefits ............................................................................7

            1.     Credit Monitoring and Insurance Services .....................................7

            2.     Documented Loss Payments............................................................7

            3.     Cash Fund Payments .......................................................................7

            4.     Prospective Relief and Changes in Business Practices Attributable  to the Settlement ..............................................................................8

            5.     The Settlement's Value to Class Members ......................................8

V.     ARGUMENT ......................................................................................................8

      A.     Legal Standards for Final Approval ..........................................................8

      B.     The Court Should Certify the Class............................................................9

      C.     The Court Should Grant Final Approval of the Settlement.......................10

            1.     The Proposed Settlement Provides a Substantial Recovery, Taking into Account the Costs and Benefits of Continued Litigation ..............................11

            2.     The Extent of Discovery Completed and the Stage of the Proceedings........14

            3.     The Proposed Settlement is the Product of Arm's-Length Negotiations and is Supported by Experienced Counsel...............................................15

4.    The Proposed Method of Distribution Is Highly Effective ...........................16

5.    The Proposed Attorney Fee Award is Reasonable .......................................17

6.    The Presence of a Governmental Participant ................................................17

7.    The Reaction of Class Members to the Proposed Settlement........................17

8.    The Court-Approved Notice Plan Satisfies Due Process and Adequately
      Provided Notice to Class Members ...............................................................17

VI.    CONCLUSION .....................................................................................................19

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**Page(s)**</u>

3

**Cases**

4

*Adoma v. Univ. of Phoenix Inc.*,
    913 F. Supp. 2d 964 (E.D. Cal. 2012) ........................................................................ 8

5

6

*Campbell v. Facebook, Inc.*,
    951 F.3d 1106 (9th Cir. 2020) ................................................................................... 13

7

*Churchill Vill., LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ............................................................................... 11, 17

8

9

*Doe v. Health Net of California.*,
    No. 5:21-cv-02975-EJD (N.D. Cal. April 23, 2021) .................................................. 2

10

*G. F. v. Contra Costa Cnty.*,
    No. 13-cv-03667, 2015 WL 4606078 (N.D. Cal. July 30, 2015) .............................. 15

11

12

*Hammond v. The Bank of N.Y. Mellon Corp.*,
    No. 08-cv-6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010) ................................ 12

13

*Harbour et al. v. California Health & Wellness Plan et al.*,
    No. 5:21-cv-03322-EJD (N.D. Cal. May 4, 2021) ................................................ 2, 6

14

15

*In re Accellion, Inc. Data Breach Litigation*,
    No. 5:21-cv-01155-EJD (N.D. Cal.) ........................................................................... 2

16

17

*In re Banner Health Data Breach Litigation*,
    No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019) ........................................... 15

18

*In re Bluetooth Headset Prods. Liab. Litigation*,
    654 F.3d 935 (9th Cir. 2011) ..................................................................................... 15

19

20

*In re Equifax Inc. Customer Data Sec. Breach Litigation*,
    No. 1:17-MD-2800, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ............................ 11

21

22

*In re Fleet/Norstar Sec. Litigation*,
    935 F. Supp. 99 (D.R.I. 1996) ................................................................................... 17

23

*In re Linkedin User Priv. Litigation*,
    309 F.R.D. 573 (N.D. Cal. 2015) .............................................................................. 13

24

25

*In re Online DVD-Rental Antitrust Litigation*,
    779 F.3d 934 (9th Cir. 2015) ................................................................................ 10, 11

26

*In re Premera Blue Cross Customer Data Sec. Breach Litigation*,
    No. 3:15-MD-2633, 2019 WL 3410382 (D. Or. July 29, 2019) ............................... 15

27

28

*In re Target Corp. Customer Data Sec. Breach Litig*ation,
   MDL No. 14-2522, 2017 WL 2178306 (D. Minn. May 17, 2017) ................................ 13

*In re The Home Depot, Inc. Customer Data Sec. Breach Litig*ation,
   No. 1:14-MD-02583, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) ............................ 13

*In re Zoom Video Communications, Inc. Privacy Litigation*,
   No. 20-cv-02155 (N.D. Cal. April 21, 2022) ................................................................ 15

*Krottner v. Starbucks Corp.*,
   406 F.App'x 129 (9th Cir. 2010) .................................................................................. 12

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) .................................................................................. 17

*Noll v. eBay*,
   309 F.R.D. 593 (N.D. Cal. 2015) .................................................................................. 10

*Pruchnicki v. Envision Healthcare Corp.*,
   845 F. App'x 613 (9th Cir. 2021) .................................................................................. 12

*Rahman v. Marriott Int'l, Inc.*,
   No. SACV2000654, 2021 WL 346421 (C.D. Cal. Jan. 12, 2021) ................................ 13

*Regents of University of California v. Superior Court*,
   220 Cal. App. 4th 549 (2013) ........................................................................................ 12

*Sutter Health v. Superior Court*,
   227 Cal. App. 4th 1546 (2014) ...................................................................................... 12

*Vunisa v. Health Net*,
   No. 5:21-cv-03425-EJD (N.D. Cal. April 6, 2021) ......................................................... 2

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ......................................................................................................... 9

*Wang v. Chinese Daily News, Inc.*,
   737 F.3d 538 (9th Cir. 2013) ........................................................................................... 9

**Statutes**

28 U.S.C. § 1715 ................................................................................................................ 17

Cal. Civ. Code § 1798.81.5(d)(1)(A) ................................................................................ 12

Cal. Civ. Code § 1798.145(c)(1)(A)-(B) ........................................................................... 13

Cal. Civ. Code § 1798.150(a)(1) ....................................................................................... 12

**Rules**

Fed. R. Civ. P. 23 ............................................................................................... 2, 10, 17

Fed. R. Civ. P. 23(a) ................................................................................................... 9

Fed. R. Civ. P. 23(a)(1) .............................................................................................. 9

Fed. R. Civ. P. 23(a)(2) .............................................................................................. 9

Fed. R. Civ. P. 23(a)(3) .............................................................................................. 9

Fed. R. Civ. P. 23(a)(4) ............................................................................................ 10

Fed. R. Civ. P. 23(b) ................................................................................................... 9

Fed. R. Civ. P. 23(b)(3) ...................................................................................... 9, 10, 17

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................... 18, 19

Fed. R. Civ. P. 23(e) ............................................................................................ 10, 16

Fed. R. Civ. P. 23(e)(1) ............................................................................................. 17

Fed. R. Civ. P. 23(e)(2) ........................................................................................... 2, 8

Fed. R. Civ. P. 23(e)(2)(C) ....................................................................................... 17

Fed. R. Civ. P. 23(e)(2)(C)(ii) ................................................................................... 16

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

The Court should grant final approval to this Settlement because it is fair, reasonable, and adequate, as the Court found at the preliminary approval stage, and because the reaction of the class is overwhelmingly positive after robust notice.

The Settlement establishes a non-reversionary cash fund of $10 million to pay for valid claims. Claimants may elect to receive: (1) three years of Credit Monitoring and Insurance Services ("CMIS"); (2) a payment for reimbursement of Documented Losses of up to $10,000; or (3) a cash payment, calculated in accordance with the terms of the Settlement Agreement (with double the amount to California residents because of the statutory claims available to them). Based on current claims, the cash payments are estimated to be approximately $243 for California Claimants and $121 for all other Claimants. The Settlement also provides robust injunctive relief and data privacy enhancements, with annual compliance certification. It releases all class claims of the approximately 1,400,125 unique Class Members against the Health Net entities only, and not any claims against Accellion.

The Settlement Administrator, Epiq, disseminated class notice as ordered by the Court, successfully delivering notice to 90% of the Settlement Class. The deadline to request exclusion from, or object to, the Settlement was December 7, 2023. Out of approximately 1.4 million potential Class Members, only 28 Class Members opted out and there were no objections. The reaction from Class Members is resoundingly positive.

The deadline for Class Members to file a Claim Form is December 22, 2023. As of December 19, 2023, a total of 31,551 Claim Forms have been submitted. *See* concurrently filed Declaration of Cameron R. Azari, Esq. Regarding Implementation and Adequacy of Notice Plan ("Azari Decl.") ¶ 31. To maximize the Class Members' participation, the parties agreed to authorize four reminder email notices, in addition to those contemplated by the initial notice program approved by the Court. The current claims represent a 2.3% claim rate.

If approved, the Settlement would deliver tangible and immediate benefits to the Class that address all the potential harms of the FTA Data Breach suffered by Class Members without protracted

1   litigation and the attendant risks of such litigation. It delivers a fair, reasonable, and adequate resolution

2   for the Class, and merits final approval. Fed. R. Civ. P. 23(e)(2).

3   **II.      STATEMENT OF THE ISSUES TO BE DECIDED**

4          Whether the Court should grant final approval of the Settlement under Fed. R. Civ. P. 23.

5   **III.    BACKGROUND**

6          **A.      The Health Net FTA Data Breach and Subsequent Litigation**

7          The Court is familiar with the details of the FTA Data Breach and the factual background of

8   this litigation. *See* ECF No. 52, at 3:3-7:21; ECF No. 53. Following Health Net's public confirmation

9   that it was impacted by the FTA Data Breach, the Actions were filed. Specifically, on April 23, 2021,

10  the action captioned as *Doe v. Health Net of California.*, No. 5:21-cv-02975-EJD ("*Doe*") was filed.

11  *Doe*, ECF No. 1. On May 4, 2021, this action, *Harbour*, was filed. *Harbour*, ECF No. 1. On May 7,

12  2021, the action captioned as *Vunisa v. Health Net*, No. 5:21-cv-03425-EJD ("*Vunisa*") was removed to

13  this Court. *Vunisa*, ECF No. 1 (complaint filed April 6, 2021).

14         On November 23, 2021, Plaintiffs filed the operative FAC in this action.[1] ECF No. 40. On

15  December 3, 2021, Plaintiffs filed a motion for preliminary approval, seeking the Court's approval of a

16  class action settlement that would resolve all claims against the Health Net Defendants relating to the

17  FTA Data Breach that were brought in *Harbour*, and *Vunisa*, but not the claims in those cases brought

18  against Accellion or any other defendants. *Id.* ECF Nos. 48, 49.

19         On March 14, 2022, the Court entered a consolidation order in *In re Accellion, Inc. Data Breach*

20  *Litigation* ("*In re Accellion*"), No. 5:21-cv-01155-EJD, ECF No. 91, vacating the previously reserved

21  April 14, 2022 hearing date for Plaintiffs' motion for preliminary approval. Following briefing on and

22  appointment of Interim Class Counsel, on May 17, 2023, Interim Class Counsel stipulated to this case

23  being severed from the consolidated *In re Accellion* matter, and the Court entered an Order on June 15,

24  2023 granting the severance stipulation. *In re Accellion*, ECF Nos. 157, 168.

25

26

27  ───────────────

    [1] The FAC adds Plaintiffs Vunisa and J. Doe, who were plaintiffs in the separately filed class actions
    pending in this District, *Doe* and *Vunisa*. This proposed Settlement would also resolve all claims against
28  Health Net alleged in *Vunisa* and *Doe*.

**B.      Mediation and Settlement Negotiations**

After filing the Actions, counsel for the Parties began a dialogue about case management issues and engaged in multiple meet-and-confer discussions. *See* concurrently filed Declaration of Tina Wolfson ("Wolfson Decl.") ¶ 15. Following successful meet and confer efforts, the Parties reached an agreement to participate in mediation. *Id*. ¶¶ 15-17.

Prior to the mediation sessions with Judge Gandhi, the Parties exchanged information to prepare for and facilitate a productive mediation session. *Id.* ¶ 18. The Parties communicated their respective positions regarding this litigation with each other and with the mediator. *Id.* Plaintiffs received and analyzed data from the Health Net Defendants relating to the impact of the FTA Data Breach on Health Net, including specific information concerning the categories of individuals who received breach notification letters from Health Net, the nature of the PII/PHI at issue, and the number of Class Members impacted, and Health Net's actions after it was notified of the breach. *Id*. This information allowed Plaintiffs to evaluate the strengths and weaknesses of the case to thoughtfully negotiate. With Judge Gandhi's guidance, the Parties had two hard-fought, rigorous, and productive mediation sessions. *Id*. ¶¶ 19-20. Between and following the two mediation sessions, the Parties continued to engage in extensive settlement discussions and negotiations, both directly and through the mediator, regarding a myriad of settlement points. *Id*. ¶¶ 20-22. This process included substantial confirmatory discovery. *Id*. ¶¶ 21, 26-33; *see* ECF No. 52, at 6:6-7:21.

The Parties expended significant efforts in negotiating and ironing out the numerous details of the Settlement. Wolfson Decl. ¶ 22. Class Counsel also solicited competing bids from separate third-party administrators for settlement notice and administration. *Id*. ¶ 23. With each of the potential settlement administrators, Class Counsel discussed the notice and distribution plans agreed to in the Settlement. *Id*. Class Counsel ultimately negotiated an agreement with Epiq Class Action and Mass Tort Solutions, LLC. *Id*.

Class Counsel crafted, negotiated, and meticulously refined the final Notice Plan and each document comprising it (with the assistance of Epiq) to ensure that the information disseminated to Class Members is clear and concise. *Id*. ¶ 24. At all times during settlement discussions, the negotiations

1  were at arm's length. *Id.* Furthermore, it was always Class Counsel's primary goal to achieve the

2  maximum relief possible for the Settlement Class. *Id.*

3  **C.    Information Learned Prior to Mediation and Through Confirmatory Discovery**

4  The Parties engaged in detailed confirmatory discovery. Through this discovery, Plaintiffs were

5  able to obtain the details surrounding the breach and were informed by Health Net of the following facts,

6  among others, which confirm the fairness, reasonableness, and adequacy of the proposed Settlement.

7  Health Net contracted with Accellion to license the FTA. *Id.* ¶ 27. In 2015, Health Net required

8  Accellion to enter into a separate Business Associate Agreement ("BAA") under which Accellion was

9  required to use strict safeguards to prevent unauthorized access to sensitive Health Net data, including

10  PII/PHI. *Id.* According to Health Net, they had no reason to believe the FTA product was not secure or

11  ill-suited for the purpose of providing secure file transfers, or that it was susceptible to a breach. *Id.*

12  Health Net confirmed that Accellion was still fully supporting the FTA as of January 20, 2021. *Id.*

13  On January 20, 2021, Accellion reported to Health Net's parent company (and Defendant in

14  this action), Centene Corporation, that threat actors exploited two zero-day vulnerabilities in the FTA

15  platform, which potentially allowed access (without authorization) to data stored on the FTA systems of

16  certain Accellion clients. *Id.* ¶ 28. On January 22, 2021, Centene received a critical security alert from

17  Accellion advising it to shut down the FTA system, after which Centene permanently discontinued use

18  of FTA. *Id.*

19  On March 24, 2021, Centene and the other Health Net entities publicly announced the data

20  breach and began sending breach notification letters to impacted persons. *Id.* ¶ 29. In total, Health Net

21  confirmed that they identified and sent notices to 1,506,868 individuals whose PII/PHI was on the FTA

22  at the time of the FTA Data Breach. *Id.* Health Net has confirmed that the data on the FTA varies by

23  individual but included Social Security numbers for 231,265 of these persons. *Id.* Health Net also

24  confirmed that within California, they sent breach notices to 1,369,180 individuals. *Id.*

25  Health Net informs that Centene secured the services of IDX to provide credit monitoring

26  services, including fraud consultation, and identity theft restoration, to affected individuals at no cost

27  for one year, and that it provided this offering out of abundance of caution. *Id.* ¶ 30. Centene confirmed

28

1  that it has never received a ransom demand relating to the FTA breach, and that it has engaged multiple

2  third-party vendors to monitor the dark web and deep dark web for any sign of its members' data,

3  including on the site where the data of other Accellion clients was posted; however, these vendors have

4  found no evidence that any Health Net's member data was exposed as a result of the FTA breach. *Id.*

5      In response to the FTA Data Breach and in connection with the proposed Settlement, Health

6  Net has engaged in the following steps, among others, to strengthen the security of their systems, many

7  of which measures will continue for a period of five years following final approval of the Settlement:

8  termination of the use of Accellion's FTA platform and migrating to another cloud-based platform for

9  secure file sharing, which was completed on February 4, 2021; enhancing existing contracting and third-

10  party risk management processes; conducting annual reviews of third-party data transfer vendors'

11  products with respect to data security and privacy; undertaking measures to secure, or securely destroy

12  if and when it is no longer needed for legitimate business purposes, all information that was subject to

13  the FTA Data Breach; continued dark web monitoring; and annual certification of compliance with the

14  foregoing measures. *Id.* ¶ 31; *see also* SA § 4.

15      **D.**    **Preliminary Settlement Approval and Dissemination of Notice**

16      On June 23, 2023, Plaintiffs re-filed their motion for preliminary approval on this docket. ECF

17  Nos. 52, 53. On August 24, 2023, the Court preliminarily approved the Settlement and ordered that the

18  Class be given Notice. *See* Prelim. App. Order ¶ 9.

19      After the Court preliminarily approved the Settlement, Class Counsel worked closely with the

20  Settlement Administrator to supervise dissemination of Notice to Class Members. Wolfson Decl. ¶ 34.

21  These efforts included reviewing and drafting the Settlement Website's language and format, the script

22  for the automated response to the toll-free number, and the language and format of the notice forms;

23  monitoring exclusion requests and for any objections; and ensuring prompt response to every Settlement

24  Class Member inquiry (whether by phone or e-mail) regarding the Settlement, among others. *Id.*

25      Epiq successfully disseminated notice to the Settlement Class in compliance with the Notice

26  Plan approved by the Court. As of December 19, 2023, an Email Notice or Postcard Notice was delivered

27

28

1  to 1,387,210 of the 1,400,125 unique,[2] identified potential Settlement Class Members. Azari Decl. ¶ 19.

2  This means the individual notice efforts reached approximately 90% of the Settlement Class. *Id.*

3        To increase Settlement Class Member participation, Epiq sent four rounds of reminder notices

4  at Class Counsel's request via email to identified Settlement Class Members, including on November 1,

5  17, 30, and December 11, 2023. *Id.* ¶¶ 20-21.

6        **E.    Class Response**

7        The response to the Settlement has been overwhelmingly positive. The deadline for Class

8  Members to opt-out or object to the Settlement passed on December 7, 2023. To date, no objections to

9  the Settlement have been filed and only 28 Class Members requested to opt-out of the Settlement. *Id.* ¶

10  29. Together, these individuals represent a miniscule percentage (less than 0.002% of the Class). By

11  contrast, as of December 19, 2023, Epiq has received 31,551 Claim Forms, reflecting a claims rate of

12  approximately 2.3%. *Id.* ¶ 31.

13  **IV.    THE SETTLEMENT**

14        **A.    The Settlement Class**

15        The preliminarily approved Settlement Class is defined as:

16        All residents of the United States who were notified by the Health Net Defendants that

17        their PHI and PII may have been compromised as a result of the FTA Data Breach.
        Excluded from the Class are: (1) the Judges presiding over the Action, Class Counsel

18        and members of their families; (2) the Health Net Defendants and Accellion, their
        subsidiaries, parent companies, successors, predecessors, and any entity in which the

19        Health Net Defendants or Accellion or their parents have a controlling interest and
        their current or former officers, directors; (3) Persons who properly opt out; and (4)

20        the successors or assigns of any such excluded Persons.

21  Prelim. App. Order ¶ 3; *see also* SA ¶ 1.46. This Settlement Class is identical to that averred in the FAC.

22  *Harbour*, ECF No. 40 ¶ 80.

23        **B.    The Release**

24        In exchange for the benefits provided under the Settlement Agreement, Class Members will

25  release any claims against Health Net and their Released Parties only, related to or arising from the FTA

26

27  ───────────────
   [2] The original reported class population of 1,506,868 noted in the preliminary approval motion was

28  reduced after analysis of unique class members and deduplication by the Settlement Administrator.

Data Breach. SA ¶ 3.5.1. The claims sought to be released by the Settlement are coextensive with the claims in the operative FAC.

### C.    The Settlement Benefits

The Settlement provides for a $10 million non-reversionary cash Settlement Fund (SA ¶ 3.6.1) that will be used to provide Participating Class Members with one of the following Settlement Benefits:

#### 1.    Credit Monitoring and Insurance Services

Each Class Member who submits a claim may elect to receive three years of CMIS. SA ¶ 4.2.1; ECF No. 52-1, Declaration of Tina Wolfson in Support of Preliminary Approval filed on June 23, 2023 ("Wolfson Prelim. Decl.") ¶¶ 4, 22 & Ex. 1. If a Class Member chooses CMIS and already maintains a subscription for a similar product, they will have the option to postpone the commencement of the CMIS by 12 months for no additional charge. SA ¶ 4.2.1. The retail value of the CMIS is $15 per month ($540 for the three-year term) per subscriber. *See* ECF No. 52-5, Declaration of Robert Siciliano in Support of Preliminary Approval filed on June 23, 2023, ¶¶ 5-6.

#### 2.    Documented Loss Payments

In the alternative to the CMIS, Class Members may seek reimbursement of up to $10,000 of Documented Losses ("Documented Loss Payment"). To receive a Documented Loss Payment, a Class Member must submit a valid Claim Form with attestation regarding the amount of the loss supported by reasonable documentary proof. SA ¶ 4.2.3.

#### 3.    Cash Fund Payments

In the alternative to CMIS or a Documented Loss Payment, Participating Class Members may submit a claim to receive a cash Settlement Payment ("Cash Fund Payment"). The amount of the Cash Fund Payment will be calculated in accordance with the terms of the Settlement Agreement. *Id.* ¶¶ 4.2.2, 4.7. In view of the heightened protections afforded to California Class Members under the California statutory claims asserted in this lawsuit (i.e., the CCPA), California Class Members who submit valid claims for Cash Fund Payments will receive Settlement Payments that are twice the amount of Settlement Payments made to non-California Class Members. SA ¶ 4.7.2.

1    In Plaintiffs' Memorandum of Points and Authorities in Support of Preliminary Approval (ECF

2   No. 52 at 9, 16), Class Counsel estimated that California Claimants will receive approximately $686 at

3   1%, $337 at 2%, and $220 at 3%, and non-California Claimants will receive approximately $343 at 1%,

4   $168 at 2%, and $110 at 3%. *Id.* Based on the claims received to date, it is believed that the Cash Fund

5   Payments will be approximately $243 for California Claimants and $121 for all other Claimants who

6   make a claim for Cash Fund Payments. Wolfson Decl. ¶ 37.

### 4. Prospective Relief and Changes in Business Practices Attributable to the Settlement

The Settlement also provides significant remedial measures regarding Health Net's data security practices that will be implemented for a period of five years, which will benefit the Class Members whether or not they submit a claim. *See* SA ¶¶ 4.1.1-4.1.4. Moreover, for five years after final approval of the Settlement, Health Net will continue to monitor the dark web for indications of fraudulent activity with respect to the potentially compromised data and notify Class Counsel of any detected indications of fraudulent activity with respect to Class Members' data. *Id.* ¶ 4.1.5. Health Net has also agreed to certify compliance annually with all injunctive and remedial relief measures provided for under the Settlement. *Id.* ¶ 4.1.6.

### 5. The Settlement's Value to Class Members

The value of the Settlement is significant. The cash fund value of the Settlement is $10,000,000. *Id.* ¶¶ 1.50, 3.6. This does not include the value of the Settlement's prospective relief or the retail value of the CMIS.

## V. ARGUMENT

### A. Legal Standards for Final Approval

Final approval is a multi-step inquiry: first, the Court must certify the proposed settlement class; second, it must determine that the settlement proposal is "fair, reasonable, and adequate;" and third, it must assess whether notice has been provided in a manner consistent with Rule 23 and due process. Fed. R. Civ. P. 23(e)(2); *Adoma v. Univ. of Phoenix Inc.*, 913 F. Supp. 2d 964, 972 (E.D. Cal. 2012). These

1    procedures safeguard class members' due process rights and enable the Court to fulfill its role as the

2    guardian of class interests. The Settlement satisfies each of these requirements.

3         **B.        The Court Should Certify the Class**

4         Class certification under Rule 23 is a two-step process. First, the plaintiff must demonstrate that

5    numerosity, commonality, typicality, and adequacy are met. Fed. R. Civ P. 23(a). "Class certification is

6    proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been

7    satisfied." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013) (quoting *Wal-Mart*

8    *Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). A plaintiff must then establish that one of the bases for

9    certification in Rule 23(b) is met. Here, Plaintiffs must demonstrate that "questions of law or fact

10   common to Class Members predominate over any questions affecting only individual members, and . .

11   . [that] a class action is superior to other available methods for fairly and efficiently adjudicating the

12   controversy." Fed. R. Civ. P. 23(b)(3).

13        On August 24, 2023, the Court preliminarily approved the following Class definition:

14
15        All residents of the United States who were notified by the Health Net Defendants
         that their PHI and PII may have been compromised as a result of the FTA Data
16        Breach. Excluded from the Settlement Class are: (1) the Judges presiding over the
         Action and members of their families; (2) the Health Net Defendants and Accellion,
17        their subsidiaries, parent companies, successors, predecessors, and any entity in
         which the Health Net Defendants or Accellion or their parents, have a controlling
18        interest, and their current or former officers and directors; (3) Persons who properly
         execute and submit a Request for Exclusion prior to the expiration of the Opt-Out
19        Period; and (4) the successors or assigns of any such excluded Persons.

20   Prelim. App. Order ¶ 3.

21        Nothing has occurred that would change the Court's previous determination that Plaintiffs have

22   satisfied the Rule 23 requirements. First, pursuant to Rule 23(a)(1), numerosity is satisfied as the Class

23   consists of approximately 1.4 million Class Members. Wolfson Decl. ¶ 2; Azari Decl. ¶ 12. Pursuant to

24   Rule 23(a)(2), there are questions of law or fact common to the Class, including: the nature of Health

25   Net's data security practices, whether Health Net knew or should have known that Accellion's FTA was

26   unsecure, whether Health Net owed duties of care to Class Members to safeguard their PII/PHI, and

27   whether Health Net breached those duties, among others. Rule 23(a)(3) requires that "the claims or

28

---

defenses of the representative parties are typical of the claims or defenses of the class." Here, the claims of the named Plaintiffs are typical of the claims of the Settlement Class. Plaintiffs are all individuals who were notified by Health Net that their PII/PHI was impacted because of the breach; the Class Members are also individuals who were notified that their PII/PHI was impacted by the breach. Plaintiffs' and Class Members' claims arise from the same nucleus of facts relating to the FTA Data Breach, pertain to common defendants, and are based on the same legal theories. Finally, under Rule 23(a)(4), Plaintiffs and their counsel do not have any conflicts of interest with other Class Members and have demonstrated their commitment to prosecute the action vigorously on behalf of the Class.

The requirements under Rule 23(b) are also satisfied. Plaintiffs seek certification under Rule 23(b)(3), which provides that a class action can be maintained where: (1) the questions of law and fact common to members of the class predominate over any questions affecting only individuals; and (2) the class action mechanism is superior to the other available methods for the fair and efficient adjudication of the controversy. *Noll v. eBay*, 309 F.R.D. 593, 604 (N.D. Cal. 2015). Here, Plaintiffs' claims depend on whether Health Net had reasonable data security measures in place to protect Plaintiffs' and Class Members' PII/PHI, and whether Health Net could have prevented unauthorized exposure or compromise of Plaintiffs' PII/PHI or mitigated its effects with more adequate third-party risk management practices. These questions can be resolved using the same evidence for all Class Members, including Health Net's internal documents, testimony of its employees, and expert analysis. In addition, the class action mechanism is superior for resolving this matter given the very large size of the proposed Class weighed against the expense and burden of individual actions. Because Plaintiffs satisfy the Rule 23 requirements, the Court should grant final certification of the Class.

**C.      The Court Should Grant Final Approval of the Settlement**

Rule 23(e) requires the district court to determine whether a proposed settlement is "fair, reasonable, and adequate*." In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934, 944 (9th Cir. 2015). To assess the fairness of a class settlement, Ninth Circuit courts consider a number of factors, including: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of future litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in

1    settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience

2    and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class

3    members to the proposed settlement. *Id.* at 944 (citing *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566,

4    575 (9th Cir. 2004)).

5                    **1.    The Proposed Settlement Provides a Substantial Recovery, Taking**

6                         **into Account the Costs and Benefits of Continued Litigation**

7                    While Plaintiffs believe that they would succeed in litigation and be able to recover damages

8    on behalf of the Class, the risks presented by continued ligation were apparent.

9                    The Health Net Defendants have steadfastly denied Plaintiffs' allegations of wrongdoing, and

10   in continued litigation (and but for the Settlement), Health Net would have vigorously defended against

11   Plaintiffs' claims. Health Net responded to Plaintiffs' CCPA demand letter that it did not violate the

12   CCPA or had cured any violation of the statute. Wolfson Decl. ¶¶ 12-13. Health Net also sent notice to

13   impacted individuals, offered one year of credit monitoring and ID theft insurance, and hired multiple

14   third-party vendors to monitor dark web and deep dark web activity for signs of fraud relating to its

15   customers' PII/PHI. ECF No. 52, at 7:4-11. Critically, as part of the confirmatory discovery process

16   and during settlement negotiations, the Health Net Defendants confirmed that none of the impacted

17   Settlement Class Members' PII/PHI was published or offered for sale on the dark web, and that Health

18   Net never received a ransom demand relating to the FTA Data Breach. *Id.*; Wolfson Decl. ¶ 30.

19                   These considerations, and others, made continued litigation risky. Data breach cases are, by

20   nature, especially risky and expensive. Such cases also are innately complex. *See, e.g., In re Equifax*

21   *Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800, 2020 WL 256132, at *32-33 (N.D. Ga.

22   Mar. 17, 2020) (recognizing the complexity and novelty of issues in data breach class actions). This

23   case is no exception. It involves approximately 1.4 million Class Members, complicated and technical

24   facts, well-funded defendants, and numerous contested issues on class certification and substantive

25   defenses. There are numerous substantial hurdles that Plaintiffs would have had to overcome before the

26   Court might find a trial appropriate.

27

28

1    First, given the early stage of the litigation, the legal sufficiency of Plaintiffs' pleading has not

2    been tested by a motion to dismiss, including Article III standing. Establishing a cognizable injury tied

3    to Health Net's conduct (as opposed to, for instance, another data breach or some other cause) can

4    present challenges. *See, e.g.*, *Krottner v. Starbucks Corp.*, 406 F.App'x 129 (9th Cir. 2010) (holding

5    that, although plaintiffs established injury-in-fact for standing purposes, they failed to allege cognizable

6    damages in a data breach case); *Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 614 (9th

7    Cir. 2021) (affirming dismissal of data breach class action for failure to allege cognizable damages).

8    Data breach cases, particularly, face substantial hurdles in surviving past the pleading stage.

9    *See, e.g.*, *Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08-cv-6060, 2010 WL 2643307, at *1

10   (S.D.N.Y. June 25, 2010) (collecting cases). Were litigation to proceed, there would be numerous expert

11   reports and costly depositions, which would present significant expenses. As in any data breach class

12   action, establishing causation and damages on a class-wide basis is largely unchartered territory and full

13   of uncertainty.

14   The California statutory claims also face risk of dismissal on the pleadings or an unfavorable

15   disposition at summary judgment. For example, California courts have ruled that under the CMIA, a

16   plaintiff may not recover damages due to mere theft of medical information; rather, plaintiffs must allege

17   that an unauthorized person actually viewed the confidential information. *Sutter Health v. Superior Ct.*,

18   227 Cal. App. 4th 1546, 1550 (2014); *see also Regents of University of California v. Superior Court*,

19   220 Cal. App. 4th 549 (2013).

20   The CCPA is relatively new and untested and presents claims that also bear significant risks.

21   For example, the CCPA's private cause of action provision, Cal. Civ. Code § 1798.150(a)(1), states that

22   liability may be found only where the unauthorized disclosure of protected information occurs "as a

23   result of the business's violation of the duty to implement and maintain reasonable security procedures

24   and practices. . . ." *Id.* Health Net would likely dispute that it violated any duty and would seek to place

25   the blame on Accellion. Health Net may also raise challenges to the CCPA claim on standing grounds

26   for Class Members. *See* Cal. Civ. Code § 1798.150(a)(1) (providing for private cause of action only for

27   individuals who had information under § 1798.81.5(d)(1)(A) impacted in combination with their name);

28

1   *see also Rahman v. Marriott Int'l, Inc*., No. SACV2000654, 2021 WL 346421, at *3 (C.D. Cal. Jan. 12,

2   2021) (dismissing CCPA claim for lack of standing where plaintiff's more sensitive information, such

3   as SSN or passports, was not stolen). Health Net further would dispute standing and injury under the

4   CCPA based upon its claimed cure of the alleged violations.

5          Finally, the CCPA explicitly exempts "medical information" and "providers of health care" that

6   are otherwise covered by the CMIA. *See* Cal. Civ. Code § 1798.145(c)(1)(A)-(B). Health Net responded

7   to Plaintiffs' CCPA letter by denying the applicability of the CCPA, and if litigation were to continue,

8   Health Net would likely argue that individuals whose medical, health, or pharmacy information was

9   exposed in the FTA Data Breach cannot recover under the CCPA, and that those individuals can only

10  seek recovery under the CMIA.

11         The $10 million non-reversionary Settlement Fund is an excellent result that avoids the

12  uncertainty and the risk of nonpayment presented by continued litigation. With the Settlement Fund, all

13  Class Members will be eligible for a Settlement Payment in the form of distribution for CMIS, a

14  Documented Loss Payment, or a Cash Fund Payment. SA ¶ 4.2. Based on the size of the breach and per-

15  capita figures, the Settlement presents a robust relief package and valuable outcome for the Class that is

16  comparable to or better than other recent data breach class action settlements. *See, e.g., In re The Home*

17  *Depot, Inc. Customer Data Sec. Breach Litig*., No. 1:14-MD-02583, 2016 WL 6902351, at *7 (N.D. Ga.

18  Aug. 23, 2016) and ECF No. 181-2 ¶¶ 22, 38 ($13 million settlement for approximately 40 million class

19  members); *In re Target Corp. Customer Data Sec. Breach Litig*., MDL No. 14-2522, 2017 WL 2178306,

20  at *1-2 (D. Minn. May 17, 2017) ($10 million dollar settlement for nearly 100 million class members);

21  *In re Linkedin User Priv. Litig*., 309 F.R.D. 573, 582 (N.D. Cal. 2015) (settlement fund of $1.25 million

22  for claims related to approximately 6.4 million LinkedIn users' stolen account passwords). Furthermore,

23  Plaintiffs successfully obtained substantive and meaningful injunctive relief as part of this Settlement.

24  *See, e.g., Campbell v. Facebook*, *Inc*., 951 F.3d 1106, 1114 (9th Cir. 2020) (inclusion of "enhanced

25  disclosures and practices changes" in settlement agreement).

26         The Settlement is a prudent course in view of these high risks. Given that all Class Members

27  will be eligible to elect CMIS or cash payments, the Settlement provides benefits that address all

28

1    potential harms of a data breach without the substantial risk of continued litigation, which includes the

2    risk of dismissal or judgement against Plaintiffs. Further, the overwhelmingly positive response from

3    the Class, discussed *supra*, confirms that the Settlements is fair, reasonable, and adequate.

4                    **2.   The Extent of Discovery Completed and the Stage of the Proceedings**

5                    Plaintiffs have vigorously developed the facts and legal claims in this case. Plaintiffs and Class

6    Counsel have stayed abreast of all material developments involving the FTA Data Breach, and its impact

7    on Health Net. Wolfson Decl. ¶ 14. Class Counsel gathered the press releases and statements concerning

8    the breach, reviewed the information Health Net provided on its website about the breach (*see, e.g.,*

9    https://www.healthnet.com/content/healthnet/en_us/news-center/news-releases/cyber-accellion.html

10   (last visited Oct. 20, 2023)); reviewed Health Net's data breach notification letters; reviewed and

11   analyzed the detailed FTA Data Breach forensic report issued by Accellion's investigator Mandiant;

12   reviewed numerous news stories and other publicly-available sources of information relating to the

13   breach, including its impact on the Health Net Defendants and their customers; interviewed numerous

14   members affected by the breach; and kept abreast of developments as they occurred, including news of

15   additional FTA Customers being impacted by the breach. Wolfson Decl. ¶ 14.

16                   The Parties engaged in informal discovery to confirm the Settlement as fair, reasonable, and

17   adequate. As part of the negotiations and Settlement, the Parties engaged in confirmatory discovery to

18   not only verify the relevant facts, but also the fairness of the Settlement. *Id.* ¶¶ 18, 20-21, 26-33.

19   Plaintiffs received and analyzed data from the Health Net Defendants relating to the impact of the FTA

20   Data Breach on Health Net, including specific information concerning the categories of individuals who

21   received breach notification letters from Health Net, the nature of the PII/PHI at issue, and the number

22   of Class Members impacted, and Health Net's actions after it was notified of the breach. *Id.* ¶ 18.

23                   Class Counsel's knowledge of facts of this case and of the practice area more broadly informed

24   Plaintiffs' clear view of the strengths and weaknesses of the case, the decision to twice go to mediation,

25   and the decision to recommend that the Court grant approval to the Settlement. *Id.* ¶ 32.

26

27

28

**3.  The Proposed Settlement is the Product of Arm's-Length Negotiations and is Supported by Experienced Counsel**

The Court must also be satisfied that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset*, 654 F.3d 935, 946-47 (9th Cir. 2011).

Plaintiffs achieved the Settlement in contested litigation and through arm's-length negotiations that involved two mediation sessions before a highly respected mediator. Specifically, Plaintiffs undertook substantial investigation of the underlying facts, causes of action, and potential defenses. Wolfson Decl. ¶¶ 4, 11, 14. In addition, the Parties engaged in extensive arm's length negotiations, including two mediation sessions before a mutually agreed upon mediator, the Hon. Jay C. Gandhi (Ret.) on July 19, 2021 and September 27, 2021. *Id.* ¶¶ 17-24.

Judge Gandhi, a highly respected and experienced mediator, has extensive experience in class action litigation, including multiple data breach cases where a settlement was reached and subsequently approved.[3] His involvement here further confirms the absence of collusion. *G. F. v. Contra Costa Cnty.*, No. 13-cv-03667, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quotation marks and citation omitted).

*Bluetooth* identified three "signs" of possible collusion: (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class. *Bluetooth,* 654 F.3d at 947.

None of the *Bluetooth* signs are present here. There is no "clear sailing provision" and Class Counsel is not seeking fees in excess of the 25% Settlement Fund benchmark set by *Bluetooth*. *Id.* at

---

[3] *See, e.g., In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633, 2019 WL 3410382, at *1 (D. Or. July 29, 2019); *In re Banner Health Data Breach Litig.*, No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019), ECF No. 170, at 6 (mediation with Judge Gandhi); *In re Zoom Video Communications, Inc. Privacy Litig.*, No. 20-cv-02155 (N.D. Cal. Apr. 21, 2022) (granting final approval of settlement reached after numerous mediations and extensive negotiations "facilitated by the Honorable Jay C. Gandhi (Ret.) . . . a respected mediator with significant class-action and data-privacy experience.").

942. There is no reversion of the Settlement Fund, but rather the Settlement makes every effort to distribute any Residual to the Class. *See, e.g.,* SA ¶¶ 3.7, 4.9. Any Fee Award and Costs awarded will be paid from this non-reversionary Settlement Fund, such that there was every incentive to secure the largest Settlement Fund possible.

There is no indication of collusion or fraud in the settlement negotiations and the Settlement that is being presented to the Court and none exists.

Class Counsel are experienced litigators who have successfully prosecuted and resolved numerous large consumer class actions and other complex matters, including other data breach cases. *See* previously filed Declarations of Tina Wolfson (ECF No. 57-1) ¶¶ 44-59 & Ex. 1, Timothy Blood (ECF No. 57-2) ¶¶ 26-32 & Ex. 1, and Matthew George (ECF No. 57-3) ¶¶ 13-15 & Ex. 1. Class Counsel fully endorse the Settlement as fair, reasonable, and adequate to the Settlement Class, and do so without reservation. Wolfson Decl. ¶ 40.

### 4.  The Proposed Method of Distribution Is Highly Effective

Rule 23(e)(2)(C)(ii) requires consideration of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*, Advisory Comm. Note to 2018 amendment.

To file a claim, Class Members need only complete a Claim Form and select a form of relief. For Class Members electing a Documented Loss Payment they must submit the Claim Form along with documents supporting their claimed losses. SA ¶ 5.1.1. Claim Forms may be submitted electronically or in hard copy. *Id*. All Claim Forms are being processed by Epiq, an experienced and nationally recognized class action administration firm. *Id.* ¶¶ 5.1.2. Epiq has assigned specific case numbers to Class Members. Azari Decl. ¶ 30. The methods of distributing relief to Class Members – both through digital and physical check avenues – are reasonable. *Id.*

### 5. The Proposed Attorney Fee Award is Reasonable

The terms of any proposed attorneys' fees award, including the timing of payment, is a factor requiring analysis under Fed. R. Civ. P. 23(e)(2)(C). As set forth in Plaintiffs' Motion for Attorney Fees, Expenses, and Service Payments filed on October 31, 2023 (ECF No. 57) ("Fee Motion"), Class Counsel is seeking attorneys' fees in the total amount of $2,500,000, which is equal to the 25% of the Settlement Fund, plus reimbursement of reasonable costs and expenses. Plaintiffs incorporate by reference all arguments in the Fee Motion (ECF No. 57).

### 6. The Presence of a Governmental Participant

No governmental agency is involved in this litigation. The Attorney General of the United States and Attorneys General of each State have been notified of the proposed Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and will have an opportunity to raise any concerns or objections. Azari Decl. ¶ 8.

### 7. The Reaction of Class Members to the Proposed Settlement

The Court should consider the reaction of Class Members to the proposed settlement when determining the Settlement's fairness. *Churchill Vill.*, 361 F.3d at 575. "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action are favorable to the class members." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) (collecting cases); *see also In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 107 (D.R.I. 1996).

Following a highly successful notice campaign, including a total of four reminder emails, 31,551 Class Members responded by December 19, 2023, only 28 requests for exclusion were submitted, and no objections to the Settlement have been filed or received. Azari Decl. ¶¶ 29, 31.

### 8. The Court-Approved Notice Plan Satisfies Due Process and
### Adequately Provided Notice to Class Members

Rule 23 requires that prior to final approval, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). For classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable

1   under the circumstances, including individual notice to all members who can be identified through

2   reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Rule provides, "notice may be by one or more of

3   the following: United States mail, electronic means, or other appropriate means." *Id*.

4          Epiq has carried out a thorough individual notice campaign. As of December 19, 2023, an Email

5   Notice or Postcard Notice was delivered to 1,387,210 of the 1,400,125 unique, identified potential

6   Settlement Class Members. Azari Decl. ¶ 19.

7          Epiq sent 1,575,691 Email Notices to 699,028 identified Settlement Class Members for whom

8   a valid email address was available (some Settlement Class Members had more than one email address).

9   *Id*. ¶¶ 12-13. After completion of the Email Notice efforts, 638,223 Email Notices were undeliverable.

10  *Id*. ¶ 14. Epiq then sent 701,097 Postcard Notices to identified Settlement Class Members for whom an

11  associated physical mailing address was available who were not sent an Email Notice. *Id.* ¶ 15. The

12  Postcard Notices were sent via USPS first-class mail. *Id*. Subsequently, Epiq sent 120,430 Postcard

13  Notices to identified Settlement Class Members for whom an associated physical mailing address was

14  available, and an Email Notice was sent, but undeliverable after multiple attempts. *Id*.

15         Class Members were given the option to have a Claim Package (Long Form Notice and Claim

16  Form) mailed to them by requesting them via the toll-free telephone number or by other means. *Id*. ¶ 18.

17  As of December 19, 2023, Epiq had mailed 2,940 Claim Forms and Long Form Notices because of those

18  requests. *Id*. For Postcard Notices that were returned undeliverable, Epiq re-mails the Postcard Notices

19  to any new address available through USPS information and to addresses Epiq obtains from a third-

20  party address lookup service. *Id*. ¶ 17. As of December 19, 2023, Epiq had re-mailed 9,634 Postcard

21  Notices. *Id*. Epiq has sent four rounds of Email Reminder Notices to all Class Members who have not

22  submitted a valid Claim Form. *Id*. ¶¶ 20-21. The cost of the numerous Email Reminder Notices exceeded

23  what was initially anticipated in the notice estimates, but these efforts were initiated at the suggestion of

24  Class Counsel to bolster Class Member participation in the Settlement. Wolfson Decl. ¶ 35.

25         In addition to individual notice, Epiq also carried out a robust Internet Digital Notice Campaign.

26  The program includes targeted Digital Notice advertising on a selected advertising network and social

27  media, which are targeted to Class Members. Azari Decl. ¶ 22. As of December 18, 2023, the Digital

28

1  Notices generated at least 8,209,458 impressions through the Google Display Network, Facebook and

2  Instagram. Azari Decl. ¶¶ 23–24. The Digital Notice program will continue to run through December

3  20, 2023. *Id*. ¶ 24.

4         As of December 19, 2023, Epiq has received 31,551 Claim Forms. *Id.* ¶ 31. This means that

5  claims have been submitted by nearly 2.3% of the Class Members. This outcome comports with the 1%-

6  3% range that Plaintiffs' counsel anticipated based on the claims rates in other data breach settlements.

7  *See* Memo ISO of Mot. for Prelim. Approval, ECF No. 52 at 27–28; ECF No. 52-1, Wolfson Prelim.

8  Decl. ¶¶ 4, 24-25.

9         The proposed Notice Plan represents the best notice practicable. It was reviewed and analyzed

10 to ensure it meets the requisite due process requirements. Azari Decl. ¶ 34. Copies of all the notice

11 documents are attached as exhibits to the Azari Declaration; they are clear and concise, and directly

12 apprise Class Members of all the information they need to know to make a claim, opt out, or object. Fed.

13 R. Civ. P. 23(c)(2)(B); *see* Azari Decl. ¶ 32. The Notice Plan is consistent with, and exceeds, other

14 similar court-approved notice plans, the requirements of Fed. Civ. P. 23(c)(2)(B), and the Federal

15 Judicial Center ("FJC") guidelines for adequate notice.

16        As there is no alternative method of notice that would be practicable here or more likely to notify

17 Class Members, the Notice Plan constitutes the best practicable notice to Class Members and complies

18 with the requirements of Due Process.

19 **VI.    CONCLUSION**

20        For all the foregoing reasons, Plaintiffs respectfully request that this Motion be granted.

21

22 Dated: December 21, 2023                          Respectfully submitted,

23                                                    /s/ *Tina Wolfson*
                                                     TINA WOLFSON (SBN 174806)
24                                                   *twolfson@ahdootwolfson.com*
                                                     ROBERT AHDOOT (SBN 172098)
25                                                   *rahdoot@ahdootwolfson.com*
                                                     **AHDOOT & WOLFSON, PC**
26                                                   2600 W. Olive Avenue, Suite 500
                                                     Burbank, CA 91505-4521
27                                                   Telephone:  310.474.9111

28

1

Facsimile:  310.474.8585

2

ANDREW W. FERICH (*pro hac vice*)

3

*aferich@ahdootwolfson.com*

**AHDOOT & WOLFSON, PC**

4

201 King of Prussia Road, Suite 650

Radnor, PA 19087

5

Telephone:  310.474.9111

Facsimile:  310.474.8585

6

7

TIMOTHY G. BLOOD (SBN 149343)

*tblood@bholaw.com*

8

PAULA R. BROWN (SBN 254142)

*pbrown@bholaw.com*

9

JENNIFER L. MACPHERSON (SBN 202021)

*jmacpherson@bholaw.com*

10

**BLOOD HURST & O'REARDON, LLP**

501 West Broadway, Suite 1490

11

San Diego, CA  92101

12

Telephone: 619.338.1100

Facsimile: 619.338.1101

13

14

LAURENCE D. KING (SBN 206423)

*lking@kaplanfox.com*

15

MATTHEW B. GEORGE (SBN 239322)

*mgeorge@kaplanfox.com*

16

**KAPLAN FOX & KILSHEIMER LLP**

1999 Harrison Street, Suite 1560

17

Oakland, CA 94612

Telephone:  415.772.4700

18

Facsimile:  415.772.4707

19

*Class Counsel for Plaintiffs and the Class*

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2023, I caused to be filed the foregoing document. This document is being filed electronically using the Court's electronic case filing (ECF) system, which will automatically send a notice of electronic filing to the email addresses of all counsel of record.


Dated: December 21, 2023                    */s/ Tina Wolfson*
                                             Tina Wolfson

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF SETTLEMENT
No. 5:21-cv-03322-EJD